[Civ. No. 19381.   Second Dist., Div. Two.   July 24, 1953.]

PAUL R. WILSON, Respondent, v. ALBERT NOBELL et al., Appellants.

Houston A. Snidow for Appellants.

Betts, Ely & Loomis for Respondent.

FOX, J.—This is an action for declaratory relief and an accounting. The court declared the rights of the parties and entered judgment in favor of plaintiff for $30,625. Defendants Albert Nobell and Nobell Research Foundation appeal.

In 1938 defendant Nobell was interested in developing resinous products in which phenol and formaldehyde are the principal ingredients. Plaintiff became associated in the business and sales side of the venture. He contributed considerable time and some money. A Mr. York, however, pro-

vided the principal financing. The three parties became co-partners in the venture. The business was operated under the name of "Synthetic Resins Company." Through a contact made by plaintiff the concern entered into a contract with the Baker Oil Tool Company for a substantial cash payment and a royalty of one cent per pound to each of the partners on all resinous products used by the oil tool company—the latter company actually producing the resins it required for its own purposes. This contract was later cancelled by the Baker Company. In the meantime, however, the York interest in this enterprise was purchased by George Pepperdine, who subsequently transferred it to the George Pepperdine Foundation. (The judgment herein is also against the Pepperdine Foundation but it has not appealed.) Sometime after the beginning of World War II this venture became inactive and had no income other than that received from the Baker Oil Tool Company. Prior to this time, however, plaintiff had gone to Central America with the United States Engineering Department. While there Nobell wrote him that the resin business was again to be an active enterprise and expressed his interest in plaintiff's taking over the business department upon his return so that he could devote his time to production and the improvement of the product, in which fields he had deepest interest and greatest ability. Plaintiff returned to this country in July, 1943, and, at the solicitation of Nobell, resumed his activity in the resin business. There was no suggestion that there should be any change in plaintiff's interest in the venture. This relation continued until early January, 1944. In the meantime Nobell had caused the Nobell Research Foundation, a nonprofit corporation, to be formed with three trustees, consisting of himself, his wife, and an employee. Nobell transferred to the foundation his interest in the formulas and process for the manufacture of the resin products. On January 10th a lease and license agreement was entered into between the two foundations as lessors and Nobell as lessee for the manufacture and sale by the latter of "Phenocast," the trade name under which the resin products were then being marketed. It was recited in the agreement that each of the lessors owned an undivided one-half interest in the trade name "Phenocast" and in the process, including certain improvements, by which it was produced. Nobell, who was then operating under the fictitious name of Nobell Resins Company, acquired the right

to use the formula, improvements and name in the manufacturing and sale of the product. Plaintiff was not a party to this agreement. It recited, however, that the rights of the lessors "are subject to a prior right of Paul R. Wilson . . . to receive a royalty payment of one cent (1¢) per pound on all Phenocast manufactured and sold." The agreement was presented to plaintiff by Nobell for his approval. He made two suggested changes. The first of these was to add after his name in the quoted portion, above, the following, "& his heirs, executors and assigns." The second was to insert after the name "Phenocast" the words "or similar liquid resins." Both Nobell and Pepperdine agreed to these additions. Plaintiff assented to the agreement as thus revised though he did not sign the document in the space provided for such approval, giving as his reason that he did not deem it necessary. Plaintiff continued with the organization until the spring of 1945. In the meantime his work had been reduced to the point where a clerk could handle it. He thereupon advised Nobell that he would secure other employment. For some months after leaving the organization plaintiff received statements of the amount of business that was done. In September, 1946, he was advised that he would no longer receive "copies of all invoices" but only "a statement covering all *cast* resins sold during the preceding month." (Italics added.) Plaintiff, however, demanded an accounting and a royalty on all resin products.

Defendants make three basic contentions: (1) Plaintiff has no contractual rights which he can enforce; (2) the court erred in declaring that plaintiff was entitled to a royalty of one cent per pound on all resin products manufactured and sold by defendant and which have for their principal base the combination of phenol and formaldehyde; and (3) there is no sufficient foundation for the court's determination that the Nobell Research Foundation is the *alter ego* of defendant Albert Nobell. None of these contentions is well founded.

It is unmistakably clear that plaintiff had an interest in this venture when the contract with Baker Oil Tool Company was made. When he returned from Central America, and at the suggestion of Nobell resumed his work in the business on a salary basis rather than return to his position with a former employer, there was no suggestion that he no longer had an interest in it. He had not disposed

of his interest, and logically concluded that he still owned it. Nobell and Pepperdine and their respective foundations considered that plaintiff had an interest in the enterprise. The recital in their agreement of January 10, 1944, and their additions thereto by interlineation, justify such an inference. The net result then of the transaction between all these parties was that plaintiff disposed of his interest in this venture to the defendants for a royalty on its products. This conclusion finds evidentiary support in the agreement of January 10th and in the fact and manner of its amplification. Thus all the elements of a valid contract are present, and the agreement of January 10th furnishes a clear and definite acknowledgment of plaintiff's right to royalty payments. The prior right of plaintiff to one cent a pound royalty payment was acknowledged by Nobell on the witness stand; also, that royalty payments were due plaintiff under the agreement.

Defendants seem to think that plaintiff is asserting his rights as a third party beneficiary under the contract of January 10th. They then argue that he does not come within that principle. Defendants are in error in their initial premise. Plaintiff does not seek to recover upon that theory. The principal value of that agreement is evidentiary. This is made clear by the court's finding that plaintiff, in acting upon the proposal of the agreement of January 10th, accepted the offer by defendants to pay him one cent per pound on all resins in exchange for his interest in the venture.

There is ample evidentiary support for the trial court's declaration that plaintiff is entitled to a royalty of one cent per pound on all resin products manufactured by defendants which have as their principal ingredients a combination of phenol and formaldehyde. Since Phenocast was simply a trade name under which the resin products were sold, it was recognized that it might be changed. Improvements in the process for manufacturing Phenocast were recited in the agreement of January 10, 1944. Laboratory experiments were being made looking to further improvement of the process. It appears to have been the purpose of the parties to protect plaintiff's interest not alone in the trade name Phenocast but to recognize his interest in the product whether sold under that or some other name, and whether produced by that precise formula or process or as a result of some variation or improvement thereof, so long as it had the same base and was similar to Phenocast. Hence the inser-

tion in the contract of January 10th of the words "or similar liquid resins" after the name Phenocast. The court's interpretation of this language finds support in even Mr. Nobell's testimony. He stated: "Our principal product today is a solution consisting of principally phenol alcohols and Phenocast *or similar liquid resins to Phenocast.*" (Italics added.) Plaintiff's discussion with Nobell was that he could not go on there unless his royalty "covered every product that was made of phenolic formaldehyde nature." Plaintiff understood his "one cent a pound would come from all of the phenol-formaldehype products manufactured and sold by the Nobell Resins Company, Albert Nobell, or the Nobell Research Foundation." It is clear that phenol and formaldehyde are the principal ingredients in the resins defendants produce, and that in the process of their manufacture the mixture is a liquid. However, through further refinements, a semisolid substance is produced which can be used as glue, or as a. coating material for wood or plaster of Paris, or for casting and other like purposes in the plastics field.

Further support is found for the court's declaration that plaintiff is entitled to a royalty on all resins defendants produce in the conduct of the parties after the transaction was consummated. (*Vogel* v. *Bankers Bldg. Corp.,* 112 Cal. App.2d 160, 166 [245 P.2d 1069].) Plaintiff did not sever his connections with the resin enterprise until more than a year after the agreement of January 10, 1944. For some months thereafter plaintiff received copies of invoices of all resins sold from which he could readily compute his royalty. It was not until September, 1946, that he was advised that such invoices would no longer be sent to him but only a "statement covering all *cast* resins sold during the preceding month" since he only had an interest in this specific item. (Italics added.) The explanation was offered that the invoices had been sent through error. The court, however, was not required to accept this explanation in view of Nobell's obvious interest in reducing plaintiff's royalty. (*Bloyd* v. *Senn,* 100 Cal.App.2d 597, 600-601 [224 P.2d 117].)

There is no basis for Nobell's claim that plaintiff's royalty was limited to casting resins. If there had been such a purpose it would have been natural so to state in the agreement of January 10th. But no such restriction is there found. This is indeed significant. On the contrary, plaintiff's right

to a royalty on Phenocast is expanded by interlineation to include other "similar liquid resins." it is also clear from the agreement and from Nobell's testimony that plaintiff's royalty covered improvements in the formula and manufacturing process. The fact that Nobell did not even mention such a limitation on plaintiff's royalty until long after the contract was executed, and sent plaintiff invoices of all sales for some time after he ceased working for the enterprise, serve to negative the good faith of Nobell's claim. Obviously, for justifiable reasons, the trial court was not impressed.

In this connection Nobell makes the point that parol evidence of the intention of the parties to the agreement should have been admitted. He points out in particular that "one of the issues to be determined by the trial court was the meaning of the term 'similar liquid resins.'" The simple answer to this proposition is that Nobel was given an opportunity to explain what he meant by that phrase. While he was on the stand the following transpired:

Q. (By Mr. Schwartz, counsel for defendants.) ". . . When you used the phrase 'Phenocast or similar liquid resins' what did you mean by that phrase as a whole? 'Phenocast or similar liquid resins.'"

MR. BETTS: "I submit that invades the province of this court."

THE COURT: "I am going to let him answer the question. Answer it, please."

Nobell's answer followed. It may be added that an abundance of extrinsic evidence was also offered by both sides. It covered the negotiations, circumstances surrounding this transaction, the situation and relation of the parties, and the purpose and object of the contract. The court was thus placed, as nearly as possible, in the position of the parties. (See Code Civ. Proc., § 1860.)

While it was proper for the court to order an accounting in order to determine the amount of royalty due plaintiff, there is no basis for including therein the period from July 1, 1943, to January 10, 1944. Plaintiff's royalty did not come into existence until about the time of the execution of the agreement on the latter date by the defendants. There is no support for the claim that plaintiff disposed of his interest in this venture as of the date of his return to its employ on July 1, 1943, or that his right to royalty payments began as of that time.

■ There is ample support and justification for the finding that Nobell Research Foundation is the *alter ego* of defendant Nobell. He and his wife, and upon occasions an employee, composed the trustees. He completely dominated and controlled the foundation. Without, so far as the records reveal, paying any consideration therefor, it became the owner of Nobell's interest in the laboratory equipment and the formula and process for the manufacture of resins and was designated as a "lessor" along with the Pepperdine Foundation in the contract of January 10th. Nobell thus used his foundation as a business agency or instrumentality in his operations. Nobell admitted he owed plaintiff royalty payments on coating resins but had made no payment thereon. His explanation was: "I am just broke, that is all. I have no money." Yet from time to time he turned over funds to the foundation and caused concerns with which he dealt to make payments to the foundation rather than to himself. But he still had the control and disposition of these funds. It is thus apparent that the research foundation was being used by Nobell to conceal his assets, and that if the foundation's separate corporate existence was to continue to be recognized a fraud or injustice would be perpetrated on plaintiff. There was therefore present all the elements necessary to justify piercing the corporate veil of the foundation and establishing the *alter ego* relationship. (*Thomson* v. *L. C. Roney & Co.*, 112 Cal.App.2d 420, 430 [246 P.2d 1017]; *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 522-523 [203 P.2d 522]; *Mirabito* v. *San Francisco Dairy Co.*, 1 Cal.2d 400, 406 [35 P.2d 513], and 8 Cal.App.2d 54, 59 [47 P.2d 530].)

Although there was no direct issue raised by the pleadings that the Nobell Research Foundation was the *alter ego* of Albert Nobell it was not prejudicial under the circumstances to admit evidence on that question. Both Nobell and the foundation were parties to the action and represented by the same counsel. Nobell was a principal witness and in possession of all the facts relative to the creation of the foundation and its relation to him. When it developed that Nobell was indebted to plaintiff; that he was "broke" and that he had turned funds and contracts over to the foundation, it became important and proper to inquire into the relationship between Nobell and the foundation so that the corporation might not be used by him to commit either a fraud or an injustice. (*Gordon* v. *Aztec Brewing Co., supra,* p. 520; *Associated Oil Co.* v. *Seiberling Rubber Co.*, 172 Wash. 204 [19 P.2d 940];

*Thomson* v. *L. C. Roney & Co., supra*; *Mirabito* v. *San Francisco Dairy Co., supra.*

There is not sufficient substance to other questions raised by defendants to justify their discussion.

The judgment is affirmed insofar as it declares the rights of the parties; the money portion, however, of the judgment is reversed with directions to ascertain the amount of royalty included therein from July 1, 1943, to January 10, 1944, and to deduct such amount therefrom, and to enter a new judgment for the difference.

Each party will bear his own costs on appeal.

Moore, P. J., and McComb, J., concurred.